Filed 9/2/15  M.D. v. Super. Ct. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| M.D.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO,<br><br>        Respondent;<br><br>SAN FRANCISCO HUMAN SERVICES AGENCY et al.<br><br>        Real Parties in Interest. | A145234<br><br>(City & County of San Francisco<br>  Superior Court Case Nos.<br>  JD 143020 & JD 143020A) |

        M.D., mother of an 11-year old daughter, I.B-D., and a ten-year old son, M.B-D., challenges the juvenile court's May 13, 2015 order terminating reunification services and setting a hearing, pursuant to Welfare and Institutions Code section 366.26.[1]  Mother filed a timely petition for an extraordinary writ.  For the reasons stated below, we deny the petition.

### FACTUAL AND PROCEDURAL BACKGROUND

        On January 22, 2014, the San Francisco Human Services Agency (Agency) filed a juvenile dependency petition pursuant to section 300, which, as amended on February 3,

---

[1]        Unless otherwise noted, all statutory references are to the Welfare and Institutions Code.

1

2014, alleged that M.D. had an untreated alcohol problem that was impacting her ability to parent her children safely. The amended petition further alleged that the children lacked any provision for support because the whereabouts of the father were unknown (although it was believed he had been deported and was currently in Guatemala) and M.D. was incarcerated for driving under the influence with a suspended license.

The Agency filed a jurisdictional report with attachments on January 22, 2014. According to the report, M.D. had been emotionally abused and sexually molested before the age of 14. A subsequently prepared substance use assessment noted that she began using alcohol at the age of 11. Her criminal history includes convictions in 2007 for driving with an open container; in 2008 for driving under the influence; in 2010 for falsely reporting a crime; and in 2012 for driving with a suspended license. She has 17 aliases. She has numerous arrests, primarily, but not exclusively, for alcohol-related offenses.

The agency received a referral on October 28, 2013 that M.D. had assaulted both of her children. The referral notes that M.D., while intoxicated the previous weekend, sat on top of and choked her daughter. Her son intervened and the maternal grandmother temporarily took the children out of the home. The following day M.D. punched her son. The daughter also reported that M.D. had previously hit her with a sandal and had slapped her. According to the son, M.D. drove him and his sister while she was drunk; on one occasion she accidentally touched his genitalia while drunk. The grandparents confirmed the allegation that M.D. drives the children when drunk. M.D., when interviewed, confirmed that she once accidentally touched her son's privates while she was drunk, but also explained that he was angry and difficult and often unwilling to shower, requiring her to watch while he showers.

M.D. also explained that she only drinks about one beer per night and does not drink during the day. She also claimed that she and I.B-D. play roughly with one another and that when I.B-D. indicated she was hurt, M.D. stopped playing.

The Agency, upon investigating the October referral, requested that M.D. sign a safety plan in order to retain custody of the minors. M.D. declined to sign the safety

2

plan.  The Agency obtained a warrant to remove the children and mother signed the safety plan on October 31, 2013.  Apparently, in return for the Agency's foregoing of its detention request that the children be detained, M.D. agreed that she would not drive the children nor be alone with them.  She also agreed to complete a Homeless Prenatal Program alcohol-related assessment and program.  In addition, the safety plan called for the maternal grandmother, the maternal step-grandfather, and maternal uncle to provide supervision.  The child welfare worker on several occasions attempted to contact M.D. in order to assess mother's compliance with the safety plan requirements. On November 26, the child welfare worker was able to speak with her.  During that conversation M.D. stated "she never agreed to refrain from being alone with [the children], and never agreed to refrain from driving them, and only agreed to refrain from driving the children to school, contrary to the safety plan as signed."  M.D. "countered she was driving [the children] to the store and to other places, that she was too busy to meet with the worker, and that she would instead telephone[] the supervisor."  At a December 5, 2013, meeting attended by the worker's supervisor, M.D. and the minors, M.D. agreed to abide by the provisions of the safety plan.  Two weeks later on December 17, 2013 the Agency received a new referral, wherein it was alleged that M.D. had become very drunk, would not allow the children to eat dinner, got on top of I-B.D., screamed at her, and pulled her hair and yelled at and grounded the minors for no reason.  The maternal uncle was at the grandmother's home during this incident and eventually stopped the fight; it was unknown why he did not intervene sooner.  M-B.D., when interviewed, stated that his grandmother was home during the incident, but could not intervene because she was "resting."  However, the agency's report questioned whether the grandmother was really home at this time.

M-B.D.'s school counselor reported that M-B.D.'s behavior had worsened in December 2013, and that the child reported that he could not think because M.D. was drinking a lot.  The school counselor also reported that a couple of coaches smelled alcohol on M.D.'s breath and one of them, who had known M.D. for years, reported that her drinking was getting worse.

The Agency removed the minors from M.D.'s care on January 31, 2014. On February 3, 2014 the Agency filed a detention report, after M.D.'s January 23, 2014 arrest for driving under the influence and with a suspended license. When it filed the report M.D. was incarcerated, no bail had been set, a further hearing was pending, and she was unavailable to care for the children. The report outlined mother's failure to cooperate with Agency's attempts to provide her with voluntary services or with the Agency's attempts to mitigate the risks to her children. In summary, with respect to mother, the report stated: M.D. "has not discontinued her use of alcohol which poses a risk to the minors in that she has been physically abusive towards [I-B.D.] when under the influence. She has not accessed other services to address or mitigate the risk of physical abuse to the minors." The juvenile court detained the children. On March 4 the Agency filed a disposition report recommending placement with the maternal grandparents and also requested that the mother receive reunification services. M.D. remained incarcerated and her release date was unknown. However, she had begun receiving services in the Santa Rita Jail, and was participating in the "Moms' Program"[2] and she was scheduled to have begun a substance abuse program. The Agency's assessment contained in its disposition report indicated that the children and M.D. were attached to one another and their relationship had many positive attributes. Nonetheless, M.D.'s use of alcohol was "abusive," posing a long-term risk of harm to the children. Past attempts to maintain the children with M.D. under supervision by relatives had been unsuccessful. M.D. continued to drive with the children while intoxicated and was physically and emotionally abusive. The children felt guilty for reporting their mother's behavior and for their removal. M.D. was minimizing her responsibility for the situation and denying she had an alcohol problem. In addition, M.D. was reported to be suffering from a brain tumor. The report noted the importance of understanding what impact this

---

[2]     The March 11, 2014 Disposition Report references M.D.'s participation in the "Mom's Program" offered in the Santa Rita Jail. It does not describe that program in any detail, other than to state M.D. was receiving "intensive case management" through the program.

might have on her cognitive and emotional state and the need for services. It recommended that the children remain with a relative and that the mother receive reunification services.

On March 26, the juvenile court took jurisdiction of the children, placed them with a relative (the maternal grandmother), and ordered that reunification services be provided to M.D. Specifically, those services required M.D. (1) to complete a substance abuse assessment and follow the treatment recommendations in the assessment, (2) complete an alcohol abuse treatment program recommended by the substance abuse counselor, (3) submit to alcohol testing, (4) participate in individual therapy focused on issues that affected her parenting, including, but not limited to, alcohol abuse and physical violence, (5) obtain medical care for any condition affecting her ability to parent, (6) visit the children as approved by the Agency, including participating in therapeutic visitation, if appropriate, and (7) sign the necessary documents for the release of information necessary to assess her completion of the reunification requirements.

The Agency filed its six-month status report, in September 2014. The six-month review recommended that the children be returned to M.D.'s care, under Agency supervision, and that M.D. receive family maintenance services. Further, the report noted that M.D. had been serving her time for driving under the influence on weekends. She had several weekends left to serve, but, other than two missed tests, had consistently been testing negative. M.D. was addressing the issues that had precipitated her involvement with the Agency and she had taken appropriate action to deal with her medical issues. She had progressed from weekly therapeutic visits with the children at Alternative Family Services to visits supervised by an approved family member. In summary, the Agency found that M.D. had made "significant progress," proactively engaging in services. The children reported that their visits with M.D. had been "going great," and she had been "extremely dedicated to complying with her case plan." Although the Agency still recommended family therapy and for M.D. to complete her outpatient [alcohol] program, it concluded "it would be safe and in the best interest of the children for [M.D.] to return home. . . ."

Unfortunately, shortly after the court conducted its six-month review, the Agency filed an addendum report on October 3, stating "the family dynamics have changed drastically." The addendum noted that on September 9, M-B.D. reported that M.D. smelled of alcohol during the visit. He stated that he would not feel safe if M.D. returned home. On September 23, M-B.D. played for the social worker a video he had recorded of his mother yelling at I-B.D. after M.D. had been drinking. That same day the social worker learned that M.D. had stopped attending her therapy sessions about two months earlier. The social worker described tension between the mother and maternal grandmother in the family's home and a "lack of consistency around rules and structure of visitation has led to a chaotic situation." As a result, the Agency recommended that M.D. be ordered to complete a residential treatment program, stating that only in an inpatient setting could the mother's alcohol use be closely monitored and, absent such monitoring, there would be great concern for the children's safety.

On January 6, 2015, the Homeless Prenatal Program, in response to the Agency's request for an assessment of mother, filed its report. It recommended continued outpatient treatment for M.D. "for the time being," but cautioned that if she missed a drug test, had a positive drug test, had a diluted drug test, or exhibited poor participation in her treatment program, that she "transfer to an intensive structured [residential] treatment program" in addition to maintaining her weekly and random testing regimen.

A contested six-month review hearing was held on January 6, 2015. At the conclusion of the hearing, the court ordered that M.D. continue to receive reunification services and supervised visits with the children.

In advance of the 12-month review hearing the Agency submitted its report recommending that reunification services be terminated. The Agency supported its recommendation based on the following evidence. M.D. had had five positive alcohol tests. During a meeting to discuss her test results she repeatedly stated she would not undergo residential treatment. When the social worker explained that only several months of family reunification services remained available, M.D. indicated she would take her chances. She would not discuss her reasons for rejecting residential treatment.

6

M.D. did request a referral for anger management classes for the children; however the social worker believed that M.D. failed to grasp the relationship between her use of alcohol and the children's anger. The Agency opined that reunification was unlikely due to the mother's denial and refusal to attend an inpatient treatment program. M.D., who had a history of seizures, suffered a major seizure on October 18, 2014; she seemed to have memory problems. She also seemed to have difficulty understanding how reunification with the children would be affected if she did not complete her case plan.[3] The social worker believed that M.D. was having difficulty understanding the implications of her failing to complete her case plan regarding the possibility of reunifying with the children and noted the possibility that M.D.'s seizures could be triggered by, among other things, inadequate medication, stress, and/or alcohol use. Regardless, the Agency did discuss with M.D. a plan to address her medical needs.

At the contested 12-month hearing the social worker testified that she believed M.D. needed residential treatment. Construing missed and abnormally diluted tests, as positive, the worker testified that M.D. had five positive tests between February 23, and April 29, 2015. The worker reported that she had been in touch with both M.D.'s prior therapist and her current therapist. The current therapist informed the worker that the mother's therapy was at the initial stage. The former therapist indicated that the mother had been engaging in the therapy, but was in a state of "strong denial" regarding her use of alcohol, and had stopped attending sessions. When M.D. refused the inpatient treatment option, as a next-best alternative, the social worker recommended that she transfer to a more intense outpatient treatment program, which M.D. started.

The social worker also testified regarding the subject of visitation. The worker indicated that mother reliably attended her therapeutic visitations with the children and that the therapist indicated that the children felt safe with her. M.D.'s cousin, N.R., testified that M.D. is close with her children and that they engage in normal activities just

---

[3] The record before us is devoid of medical documentation regarding the interaction between M.D.'s seizures, memory problems, drinking, and ability to comply with her case plan.

like any other family. The maternal grandmother and children's caretaker, R.O., generally testified that the children and M.D. enjoyed a loving relationship and that the children's behavior was improved when M.D. was present; she also stated that her daughter had improved significantly. When confronted with M.D.'s positive alcohol tests, the maternal grandmother testified, "I really don't see her drinking anymore. Maybe she is drinking, but like not that I know or not that the kids know. And for me it's like winning."

M.D. testified at the 12-month hearing. She admitted that she had not followed through on the Agency's recommendation to enter inpatient treatment, that she had tested positive for alcohol, and, she had used alcohol within a month prior to the hearing. However, she maintained that she had not drunk to excess within the past six months, had not been out of control due to alcohol during that time, had not been arrested for any alcohol-related offense during that period, and had not driven under the influence in the previous six months. She testified that "at the moment" she did not consider herself to have a "substance abuse addiction to alcohol." She stopped attending Alcoholics Anonymous about two weeks before the hearing. M.D. confirmed that she failed to graduate from Dependency Drug Court (DDC), and that she discharged herself from the program. During her substance abuse counseling in both programs mother had had two sponsors, although she did not know her sponsor's name. She testified that she had completed about two steps in the 12-step program, but was unable to remember any particular step. During her testimony at the hearing, M.D. reiterated her refusal to enter inpatient treatment because outpatient treatment was helping her "enough."

On May 13, 2015 at the conclusion of the 12-month contested hearing, the juvenile court terminated reunification services, finding that there was not a substantial probability that the children could be returned to M.D. by the 18-month review. The court's "overall concern [was] mother's continuing challenge with alcohol and her failure to accept that she has a problem, and it is a problem of a magnitude that does not enable her to safely parent her children." The court acknowledged mother's regular visitation with the children, which surpassed the number of visits which had been officially

8

approved, but concluded that she "has not demonstrated the capacity and ability to complete the objectives of the treatment plan that would enable her to provide for the children's safety, protection and physical and emotional health." The court determined that reasonable efforts had been made to provide her with services tailored to overcoming the problems that led to the children's removal and set a hearing, pursuant to section 366.26 for September 16, 2015.

On May 20, 2015, M.D. filed a notice of intent to file writ petition in the superior court and, after receiving the petition, this court issued an order to show cause on July 9, 2015. After the Agency filed its opposition, all parties waived oral argument.

## DISCUSSION

M.D.'s petition challenges the juvenile court's order terminating services and setting the section 366.26 hearing on the ground that the Agency failed to sustain its burden of proving that there was not a substantial probability of the children being returned to their mother. As explained below, substantial evidence supports the juvenile court's finding in this regard.

Both parties agree that the applicable standard of review in this case is the "substantial evidence standard." As such we do not resolve conflicts in the evidence or determine the credibility of witnesses. (*Garrett v. Duncan* (1959) 176 Cal.App.2d 296, 298.) All reasonable inferences which support the court's finding must be indulged and where more than one inference can be reasonably deduced from the facts, we may not substitute our conclusion for the juvenile court's. (*Id*. at pp. 298-299.) All evidence that supports the juvenile court's ruling is assumed to be true and unfavorable evidence is disregarded. (*Id.* at p. 299.)

I. THERE IS SUBSTANTIAL EVIDENCE TO SUPPORT THE FINDING THAT THERE IS NOT A SUBSTANTIAL PROBABILITY THAT THE CHILDREN WILL BE RETURNED TO THE MOTHER BY THE ANTICIPATED DATE OF THE 18-MONTH STATUS REVIEW HEARING.

The juvenile court has the discretion to extend the reunification period up to 18 months from when the child was originally removed from the parent's physical custody

9

only if it finds a substantial probability that the child will be returned to his parent's custody and safely maintained there. (§ 361.5, subd. (a)(3); *Denny H. v. Superior Court* (2005) 131 Cal.App.4th 1501, 1509.) To make this required finding the court must find (1) that the parent has consistently and regularly contacted and visited the child; (2) that s/he has made significant progress in resolving the problems that led to the child's removal; and (3) that s/he has demonstrated the capacity and ability to complete the objectives of his/her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs. (§ 366.21, subd. (g)(1).) Assuming reasonable services have been provided, unless there is a substantial probability of reunification within 18 months of removal, reunification services must be terminated. (See *In re Andrew L.* (2004) 122 Cal.App.4th 178, 190-91.)

The record before us reflects that the minors/children were first removed from mother on January 31, 2014. By May 13, 2015, the date the juvenile court set the section 366.26 hearing, less than three months remained for the mother to achieve her treatment goals. Yet, as late as the 12-month contested hearing, mother did not believe she suffered from an active alcohol addiction problem. She refused to enter a residential drug treatment program — while continuing to use alcohol and test positive for alcohol consumption. She did not know the name of either of her two sponsors, was only vaguely familiar with the 12-steps and she unilaterally stopped attending Alcoholics Anonymous and failed to completed her drug court program. Given her history of engaging in physical and emotional abuse regarding the minors when drunk, her repeated instances of operating a vehicle with the children as passengers when she was under the influence, her refusal to submit to residential treatment, her consistent pattern of temporary improvements and regression with respect to her ability to control her alcohol addiction, we have no trouble concluding that Agency established that there was not a substantial probability of the children being returned to their mother. Thus, the juvenile court's decision to terminate reunification services and set a section 366.26 hearing is supported by substantial evidence.

10

## DISPOSITION

The petition for an extraordinary writ is denied. To expedite the prompt resolution of this case, our decision is immediately final as to this court. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

_____
Jenkins, J.

We concur:

_____
Pollak, Acting P. J.

_____
Siggins, J.